AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 2:21-MJ-1701 |
| The person of ERIC IZMITLIAN, date of birth March 6, 1972, as described in Attachment A-1 | ) ) ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1029, 1341, 1343, 371, and 1349 | *See Affidavit* |

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Jeffrey D. Wolf

_____
*Applicant's signature*

Jeffrey D. Wolf, DOL OIG SA
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: <u>Los Angeles , CA</u>

Honorable Karen Stevenson
_____
*Printed name and title*

AUSA: Jeremiah Levine (213) 894 8323

## ATTACHMENT A-1

**PERSON TO BE SEARCHED**

The person to be searched within the Central District of California is ERIC IZMITLIAN, date of birth March 6, 1972, as pictured below:



The search of IZMITLIAN shall include any items on his person or within his immediate vicinity and control that are capable of containing items to be seized, including clothing pockets, digital devices, and containers (such as briefcases, backpacks, boxes, and purses).

**ATTACHMENT B**

## I.  ITEMS TO BE SEIZED

1.   The items to be seized are evidence, contraband, fruits, and/or instrumentalities of violations of 18 U.S.C. §§ 1029 (Fraud and Related Activity in Connection with Access Devices), 1341 (Mail Fraud), 1343 (Wire Fraud), 371 (Conspiracy), and 1349 (Conspiracy to Commit Mail or Wire Fraud) (collectively, the "Subject Offenses"), namely:

a.   Records, documents, correspondence, faxes, and e-mails sent to and received from any state workforce agency, including the California Employment Development Department, including any applications for Unemployment Insurance.

b.   Records and documents containing information, including Personally Identifiable Information, such as names, Social Security Numbers, dates of birth, addresses, phone numbers, and driver's license numbers, to be used in support of any application for Unemployment Insurance, and/or any claim of continuing eligibility for Unemployment Insurance.

c.   Checks and Electronic Benefit Payment cards received from any state workforce agency including the California Employment Development Department.

d.   Security camera footage showing activity within the SUBJECT PREMISES;

e.   Copies of and actual driver licenses, state identification cards, passports, and other forms of identification.

f.   Indicia of occupancy, residency, control, and/or ownership of the SUBJECT PREMISES (as identified in Attachment A), including utility bills, telephone bills, loan payment receipts, rent documents, keys, photographs, and bank records.

g.   Bank records or records received from financial institutions, including debit cards; correspondence regarding debit card accounts; wire transfer records; bank statements and associated transactional records; money drafts; letters of credit; safety deposit box keys and records; income tax records; payroll records; credit cards; and any other records of financial transactions that reflect the disposition and/or allocation of monies.

h.   Pre-paid cash equivalent cards.

i.   Records and communications relating to the acquisition, secreting, transfer, concealment, and/or expenditure of unemployment insurance funds.

j.   Correspondence with, and records concerning, incarcerated individuals.

k.   Records relating to any travel to any correctional facilities located in California.

l.   Contents of any calendar or date book stored on any of the digital devices.

m.   Global Positioning System coordinates and other information or records identifying travel routes, destinations, origination points, and other locations.

n.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to

29

show address book information, including all stored or saved telephone numbers.

o.    Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls.

p.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the Subject Offenses.

q.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the Subject Offenses.

r.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

a.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

30

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.  passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser

31

history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II. SEARCH PROCEDURES FOR HANDLING POTENTIALLY PRIVILEGED INFORMATION

4.     The following procedures will be followed at the time of the search in order to avoid unnecessary disclosures of any privileged attorney-client communications or work product:

### Non-Digital Evidence

5.     Prior to reading any document or other piece of evidence ("document") in its entirety, law enforcement personnel conducting the investigation and search and other individuals assisting law enforcement personnel in the search (the "Search Team") will conduct a limited review of the document in order to determine whether or not the document appears to contain or refer to communications between an attorney, including Richard Novak, or to contain the work product of an attorney, and any person ("potentially privileged information").  If a Search Team member determines that a document appears to contain potentially privileged information, the Search Team member will not continue to review the document and will immediately notify a member of the "Privilege Review Team" (previously designated individual(s) not participating in the investigation of the case).  The Search Team will not further review any document that appears to contain potentially privileged information until after the Privilege Review Team has completed its review.

6.     In consultation with a Privilege Review Team Assistant United States Attorney ("PRTAUSA"), if appropriate, the Privilege Review Team member will then review any document identified as appearing to contain potentially privileged

33

information to confirm that it contains potentially privileged information.  If it does not, it may be returned to the Search Team member.  If a member of the Privilege Review Team confirms that a document contains potentially privileged information, then the member will review only as much of the document as is necessary to determine whether or not the document is within the scope of the warrant.  Those documents which contain potentially privileged information but are not within the scope of the warrant will be set aside and will not be subject to further review or seizure absent subsequent authorization.  Those documents which contain potentially privileged information and are within the scope of the warrant will be seized and sealed together in an enclosure, the outer portion of which will be marked as containing potentially privileged information.  The Privilege Review Team member will also make sure that the locations where the documents containing potentially privileged information were seized have been documented.

7.    The seized documents containing potentially privileged information will be delivered to the United States Attorney's Office for further review by a PRTAUSA.  If that review reveals that a document does not contain potentially privileged information, or that an exception to the privilege applies, the document may be returned to the Search Team.  If appropriate based on review of particular documents, the PRTAUSA may apply to the court for a finding with respect to the particular documents that no privilege, or an exception to the privilege, applies.

Digital Evidence

8.   The Search Team will search for digital devices capable of being used to facilitate the subject offenses or capable of containing data falling within the scope of the items to be seized.  The Privilege Review Team will then review the identified digital devices as set forth herein.  The Search Team will review only digital device data which has been released by the Privilege Review Team.

9.   The Privilege Review Team will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.

10.  The Privilege Review Team and the Search Team shall complete both stages of the search discussed herein as soon as is practicable but not to exceed 180 days from the date of execution of the warrant.  The government will not search the digital device(s) beyond this 180-day period without obtaining an extension of time order from the Court.

11.  The Search Team will provide the Privilege Review Team with a list of "privilege key words" to search for on the digital devices, to include specific words like "Richard Novak" or his email addresses, and generic words such as "privileged" "work product."  The Privilege Review Team will conduct an initial review of the data on the digital devices using the privilege key words, and by using search protocols specifically chosen to identify documents or data containing potentially

35

privileged information.  The Privilege Review Team may subject to this initial review all of the data contained in each digital device capable of containing any of the items to be seized. Documents or data that are identified by this initial review as not potentially privileged may be given to the Search Team.

12.  Documents or data that the initial review identifies as potentially privileged will be reviewed by a Privilege Review Team member to confirm that they contain potentially privileged information.  Documents or data that are determined by this review not to be potentially privileged may be given to the Search Team.  Documents or data that are determined by this review to be potentially privileged will be given to the United States Attorney's Office for further review by a PRTAUSA. Documents or data identified by the PRTAUSA after review as not potentially privileged may be given to the Search Team.  If, after review, the PRTAUSA determines it to be appropriate, the PRTAUSA may apply to the court for a finding with respect to particular documents or data that no privilege, or an exception to the privilege, applies.  Documents or data that are the subject of such a finding may be given to the Search Team. Documents or data identified by the PRTAUSA after review as privileged will be maintained under seal by the investigating agency without further review absent subsequent authorization.

13.  The Search Team will search only the documents and data that the Privilege Review Team provides to the Search Team at any step listed above in order to locate documents and data that are within the scope of the search warrant.  The Search

Team does not have to wait until the entire privilege review is concluded to begin its review for documents and data within the scope of the search warrant. The Privilege Review Team may also conduct the search for documents and data within the scope of the search warrant if that is more efficient.

14. In performing the reviews, both the Privilege Review Team and the Search Team may:

a. search for and attempt to recover deleted, "hidden," or encrypted data;

b. use tools to exclude normal operating system files and standard third-party software that do not need to be searched; and

c. use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

d. Neither the Privilege Review Team nor the Investigation Team will seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

15. If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

a. If the search determines that a digital device does contain data falling within the list of items to be seized,

the government may make and retain copies of such data, and may access such data at any time.

     b.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

     c.  The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

     d.  After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

    16.  The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the

custody and control of attorneys for the government and their
support staff for their independent review.

17.  In order to search for data capable of being read or
interpreted by a digital device, law enforcement personnel are
authorized to seize the following items:

a.  Any digital device capable of being used to
commit, further, or store evidence of the offense(s) listed
above;

b.  Any equipment used to facilitate the
transmission, creation, display, encoding, or storage of digital
data;

c.  Any magnetic, electronic, or optical storage
device capable of storing digital data;

d.  Any documentation, operating logs, or reference
manuals regarding the operation of the digital device or
software used in the digital device;

e.  Any applications, utility programs, compilers,
interpreters, or other software used to facilitate direct or
indirect communication with the digital device;

f.  Any physical keys, encryption devices, dongles,
or similar physical items that are necessary to gain access to
the digital device or data stored on the digital device; and

g.  Any passwords, password files, biometric keys,
test keys, encryption codes, or other information necessary to
access the digital device or data stored on the digital device.

18. During the execution of this search warrant, law
enforcement is permitted to: (1) depress ERIC IZMITLIAN's thumb

and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of ERIC IZMITLIAN's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

19.  The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

### AFFIDAVIT

I, Jeffrey D. Wolf, being duly sworn, declare and state as follows:

### I.    INTRODUCTION

1.    I am a Special Agent ("SA") with the United States Department of Labor ("DOL"), Office of Inspector General ("OIG"), and have served in this capacity for eight months. I am presently assigned to the Los Angeles Regional Office. My responsibilities as a DOL-OIG Special Agent include investigating unemployment insurance fraud, mail fraud, and identity theft, as well as other related crimes. I am a graduate of the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia. As part of the training provided at FLETC, I successfully completed the Basic Training course, which included, but was not limited to, courses in criminal and constitutional law. I served on active duty with the United States Coast Guard for over 13 years, and over 9 years with the United States Coast Guard Reserve. Before my employment with DOL-OIG, I was employed as an investigator for the DOL, Office of Labor Management Standards, responsible for conducting civil and criminal investigations.

### II.  PURPOSE OF AFFIDAVIT

2.    This affidavit is made in support of search warrants for the person of ERIC IZMITLIAN, as further described in Attachment A-1; and for the commercial property known as "Gold Diggers" located at 14719 Rinaldi Street, San Fernando, California 91340 (the "SUBJECT PREMISES") as described in

Attachment A-2, for the items to be seized described in
Attachment B.

3.    The items to be seized are the evidence, fruits, and
instrumentalities of violations of 18 U.S.C. §§ 1029 (Fraud and
Related Activity in Connection with Access Devices), 1341 (Mail
Fraud), 1343 (Wire Fraud), 371 (Conspiracy), and 1349
(Conspiracy to Commit Mail or Wire Fraud) (collectively, the
"Subject Offenses"), as described more fully in Attachment B,
which is incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested warrant and does
not purport to set forth all of my knowledge of or investigation
into this matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

## III.  BACKGROUND INFORMATION ON UNEMPLOYMENT INSURANCE BENEFITS AND COVID-19-RELATED FRAUD

5.    Since 1935, the U.S. Department of Labor's
Unemployment Insurance ("UI") program has provided unemployment
benefits to eligible workers who become unemployed through no
fault of their own.  This program ensures that at least a
significant portion of the necessities of life -- most notably
food, shelter, and clothing -- are met on a weekly basis while
the worker seeks employment.  UI beneficiaries who meet the

requirements of the applicable state law are eligible for this temporary financial assistance.  Each state administers a separate UI program within the guidelines established by federal law.  In the State of California, the Employment Development Department ("EDD") administers the UI program for residents and others physically performing work activities in California.

6.    On March 13, 2020, the President of the United States declared the COVID-19 pandemic an emergency under the Robert T. Stafford Disaster Relief and Emergency Assistance Act.  On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") was enacted to provide emergency assistance and health care response for individuals, families, and businesses affected by the COVID-19 pandemic.  The CARES Act included, among other things, the establishment of (1) the Pandemic Unemployment Assistance ("PUA") benefit to provide financial assistance to individuals who are out of work due to the pandemic, including those who do not usually qualify for regular state UI such as self-employed, contract, and "gig workers;" (2) the Pandemic Emergency Unemployment Compensation ("PEUC") benefit, a 13-week benefit extension for people who have used all benefits available in their regular UI claim; and (3) the Pandemic Additional Compensation ("PAC") benefit, an additional $600 federal stimulus payment automatically added to each week of benefits received between March 29, 2020, and July 25, 2020.

7.    California EDD began accepting applications for PUA benefits on or about April 28, 2020.  Applications may be made online from any digital device, including any smartphone, that

connects to the Internet and is capable of accessing the EDD website's UI benefits page.

8.   Persons applying for PUA benefits do not need to submit any supporting documents to the EDD with their applications.  Claimants enter their total income for the 2019 calendar year on the application.  The stated income will be used to pay the minimum benefits of $167 per week.  EDD may request documentation to provide proof of the stated income.[1] If the income information provided by the PUA claimant meets an annual earnings threshold of $17,368 or more, the EDD will work as quickly as possible to verify the claimant's income using other resources available to EDD in order to increase the PUA weekly benefit amount.

9.   Like regular UI claims, PUA claims can be filed online.  When an individual files a PUA claim online, EDD automatically maintains certain information regarding the filing of the claim.  This information includes the date and time the claim was submitted, the name of the person for whom the claim was filed, and the Internet Protocol ("IP") address of the computer, or Internet Service Provider ("ISP") account, that was used to file the claim.

10.  A PUA claimant must answer various questions to establish his or her eligibility for PUA benefits.  The claimant must provide his or her name, social security number, and mailing address.  The claimant must also identify a qualifying

---

[1] In general, EDD accepts items such as an annual tax return, 1099 forms, W-2s, and pay stubs as proof of income.

occupational status and COVID-19-related reason for being out of work.

11.  After it accepts a UI claim, including a claim submitted pursuant to the PUA program, EDD typically deposits UI funds every two weeks to an Electronic Benefit Payment ("EBP") debit card administered by Bank of America ("BofA"), which the claimant can use to pay for his/her expenses.  The EBP card is sent via the U.S. Postal Service to the claimant at the address the claimant provides in their UI claim.  Claimants can activate their debit card over the phone or online.

12.  When receiving regular UI benefits, a claimant must complete a Continued Claim Form (DE 4581) and certify every two weeks, under penalty of perjury, that he/she remains unemployed and eligible to receive UI benefits.  EDD authorizes and deposits payment to the EBP debit card after it receives the Continued Claim Form.  At present, weekly PUA benefits typically range from $40 to $450.

13.  Once PUA claims are submitted and processed, EDD mails EBP cards to the addresses provided on the claims.  Recipients can use the EBP debit cards to withdraw the UI benefits by making cash withdrawals at Automated Teller Machines and points of sale.

## IV.  <u>SUMMARY OF PROBABLE CAUSE</u>

14.  IZMITLIAN owns and operates a gold shop called "Gold Diggers" at the SUBJECT PREMISES.  IZMITLIAN has felony convictions for identity theft and possession of a controlled substance in 2001, and grand theft in 2006, all in the Los

Angeles County Superior Court.  In April and May of 2019,
IZMITLIAN purchased at least two stolen firearms at the SUBJECT
PREMISES and hid the firearms in the ceiling of the business.
Law enforcement found these stolen firearms, and another stolen
firearm, during the execution of a search warrant in June 2019.
In November of 2019, IZMITLIAN was indicted for felon in
possession of firearms in violation of 18 U.S.C. § 922(g)(1),
pled guilty, and awaits sentencing.

    15.  During an unrelated investigation, in September of
2020, law enforcement recovered and searched a cellular phone
belonging to K.R.  The phone contained SMS and MMS messages with
the SUBJECT PREMISES' business phone number, which is a cellular
phone believed to be used by IZMITLIAN.  The messages showed
that K.R. sent IZMITLIAN approximately 53 identity profiles so
that IZMITLIAN could submit fraudulent EDD claims.  IZMITLIAN
submitted fraudulent EDD claims for the individuals from the
SUBJECT PREMISES' IP address, and 25 of the individuals were
issued EDD payments.  Between April and September of 2020, 82
claims for UI benefits were submitted from the SUBJECT PREMISES'
IP address.  I believe many or all of the claims were fraudulent
because, among other things: (1) the messages between K.R. and
IZMITLIAN suggest that IZMITLIAN fabricated certain occupation
information on the UI applications; (2) five of the 82
applications list the SUBJECT PREMISES as the mailing address
for benefits, even though the claimants do not appear to live or
work at the SUBJECT PREMISES; (3) the messages appear to show
that at least one potential applicant is incarcerated, which

would make him ineligible to receive UI benefits; (4) the
messages appear to show that after IZMITLIAN submits UI claims,
K.R. delivers money to IZMITLIAN, which in my training and
experience indicates that IZMITLIAN is submitting fraudulent
claims for pay; and (5) based on my training and experience,
when a high volume of UI applications comes from a single IP
address without a legitimate explanation, that is an indication
of fraud.

## V.   <u>STATEMENT OF PROBABLE CAUSE</u>

### A.   **IZMITLIAN Owns and Operates a Shop Called Gold Diggers at the SUBJECT PREMISES**

16.   I know the following based on my discussion with
Federal Bureau of Investigation ("FBI") Special Agent Dennis An,
and my review of FBI and Los Angeles County Sheriff's Department
("LASD") reports:

a.   IZMITLIAN operates a gold shop called "Gold
Diggers" at the SUBJECT PREMISES.  IZMITLIAN told Agent An that
Gold Diggers is registered with the state of California under the
name of his ex-wife, but that IZMITLIAN owns and operates Gold
Diggers.[2]  In other interviews with law enforcement, IZMITLIAN
stated that he co-owns Gold Diggers with his ex-girlfriend, but
again emphasized that he is the daily operator of the business.
In February of 2021, I observed IZMITLIAN access Gold Diggers
using a key, and saw the "open" sign on the store appear shortly
afterwards.  IZMITLIAN also purports to own Gold Diggers in his

---

[2] IZMITLIAN initially denied to Agent An that he owned the
SUBJECT PREMISES before admitting it.

LinkedIn profile, which was captured by Agent An in late 2019 or early 2020, as shown below:



**B.    IZMITLIAN Recently Pled Guilty to Felon in Possession of Firearms and Ammunition in violation of 18 U.S.C. § 922(g)(1) in Connection with Purchasing Firearms at the SUBJECT PREMISES**

17.  I know the following based on my discussion with Agent An, and my review of FBI and LASD reports:

a.     In May of 2019, three men burglarized a safe in a storage unit in Valencia, California, stealing 36 guns.  Shortly afterwards, law enforcement observed one of the burglars delivering boxes to the SUBJECT PREMISES.  Law enforcement arrested that burglar and IZMITLIAN, although law enforcement later determined that IZMITLIAN was not one of the burglars.  On June 12, 2019, Judge Lillian Vega Jacobs of the Los Angeles Superior Court issued a warrant to search the SUBJECT PREMISES for the stolen guns.  During the execution of the search warrant, law enforcement found three stolen guns hidden in the ceiling, as well as ammunition.  Two of the firearms were from the Valencia burglary, and another had been reported stolen earlier.  The SUBJECT PREMISES' surveillance footage showed IZMITLIAN handling firearms that, based on the training and experience of Agent An, matched the make and model of those stolen in the Valencia burglary.  Still images from the SUBJECT PREMISES' surveillance footage of IZMITLIAN handling what appear to be firearms stolen in the Valencia burglary appear below:



     b.    IZMITLIAN later confessed to Agent An that he purchased firearms from the Valencia burglary at the SUBJECT PREMISES.

     c.    Law enforcement also found pay-owe sheets during the search of the SUBJECT PREMISES. IZMITLIAN admitted the pay-owe sheets were his, and that one of the entries indicated that IZMITLIAN had sold a firearm in a transaction unrelated to the purchase of guns from the Valencia burglary.

     d.    IZMITLIAN is a convicted felon, having been convicted of felony identity theft in 2001, in violation of California Penal Code Section 530.5(a); Possession of a Controlled Substance, in violation of California Health and Safety Code Section 11377(a), in 2001; and Grand Theft, in violation of California Penal Code Section 487(a), in 2006, all in the Los Angeles County Superior Court.

e.    On November 19, 2019, IZMITLIAN was indicted for one count of felon in possession of firearms and ammunition in violation of 18 U.S.C. § 922(g)(1) in United States v. Izmitlian, Case No 19-CR-691-MWF.   IZMITLIAN was arrested pursuant to the indictment, and has been out of custody on bond since approximately January 29, 2020.   On February 11, 2020, IZMITLIAN pled guilty to felon in possession of firearms and ammunition as charged in Count One of the indictment, and is scheduled to be sentenced on July 28, 2021.

## C.    IZMITLIAN Submits Fraudulent UI Claims from the SUBJECT PREMISES

18.    Based on my review of LASD reports from September of 2020, and on correspondence with Agent An from October of 2020, I know the following:

a.    In September of 2020, LASD deputies attempted to stop a Dodge pickup truck being driven by a suspected drunk driver in Lancaster, California.   During the pursuit, the truck caused a traffic collision, killing the driver of another vehicle and her unborn child.   In the investigation that followed, law enforcement discovered that the truck was rented by IZMITLIAN.   The driver was K.R.

b.    Law enforcement recovered two phones from the accident scene.   On September 21, 2020, Magistrate Judge Lisa Chung of Los Angeles County Superior Court signed a warrant to search the phones.   On one of the phones, there was extensive SMS and MMS contact between K.R. and a person I believe to be

IZMITLIAN at telephone number 818-599-7893 (the "Subject
Telephone").

19.  I believe that IZMITLIAN is the user of the Subject
Telephone for the following reasons: Agent An told me that in an
interview in 2020, IZMITLIAN told Agent An that 818-599-7893
(the Subject Telephone) was the phone number for the SUBJECT
PREMISES, and that IZMITLIAN operates the SUBJECT PREMISES and
uses the Subject Telephone.  I have also observed that the
Subject Telephone number appears on a sign in the window of the
SUBJECT PREMISES.  Further, the social media platform Instagram
has a page titled "Izmitlian," which references ERIC IZMITLIAN
and lists the Subject Telephone as the contact phone number.
Subscriber records obtained from Charter Communications, Inc.,
which is the internet service provider for Gold Diggers,
identified a commercial location named "CASH 4 GOLD," at the
address of the SUBJECT PREMISES, show the associated user name
EIZMITLIAN@GMAIL.COM, and list the Subject Telephone as the
contact number for the account.

20.  From approximately June 28, 2020, through August 27,
2020, K.R. sent the Subject Telephone SMS and MMS messages
containing at least 53 identity profiles, including, variously,
social security numbers and other personal identifying
information ("PII"), for the purpose of filing unemployment
insurance claims.  Based on the text messages, it appears that
in at least some instances, K.R. collected PII from others, and
IZMITLIAN fabricated additional information to create fraudulent
UI applications.  For example, immediately after K.R. sent the

name, social security number, birthdate, phone number, email,
and address of N.C., K.R. and IZMITLIAN, via the Subject
Telephone, had the following exchange:[3]



---

    [3] K.R.'s messages are on the right, and IZMITLIAN's
responses from the Subject Telephone are on the left.

21.   In another instance, K.R. sent IZMITLIAN information demonstrating their apparent shared intention to submit an application for an incarcerated individual:[4]



22.   In another instance, K.R. agreed to bring IZMITLIAN money after what appears to be a successful submission of a UI claim:



_____

[4] Incarcerated individuals are ineligible for UI. Ultimately, EDD does not have a record of a UI application for this incarcerated individual.

23.   Based on my review of records obtained from EDD, 25 of the individuals identified by K.R. in his messages to IZMITLIAN were granted UI benefits.  EDD issued payments for 18 of those 25 individuals.

24.   From April 2020 through September 2020, the SUBJECT PREMISES' IP address submitted at least 82 UI claims.  Based on my training and experience, I know that a single IP address submitting numerous applications is often an indication of fraud.

25.   EDD authorized approximately $1,649,960 to be paid based on the 82 claims mentioned above.

26.   From the group of 82 claims submitted from the SUBJECT PREMISES' IP address, I reviewed the five claims that listed the SUBJECT PREMISES as the claimant's physical address.  I summarize those five claims in the table below:

| Claimant | Claim Date | Claimed Reason for Unemployment | Type of Employment Affected/ Date Affected | Claimed Amount |
|----------|-----------|--------------------------------|-------------------------------------------|----------------|
| V.B. | 8/25/20 | COVID-19 | Tattoo Artist/ 3/20/20 | Approved $35,550 |
| J.B. | 7/02/20 | COVID-19 | Retail Sales/ 3/19/20 | Approved $1,299 |
| R.D. | 8/17/20 | COVID-19 | Tattoo Artist/ 3/19/20 | Approved $30,000 |
| S.G. | 8/08/20 | COVID-19 | Tattoo Artist/ 3/20/20 | Approved $30,000 |
| J.T. | 8/27/20 | COVID-19 | Barber/ 3/20/20 | Approved $30,000 |

27.   Four of the five claims list tattoo artist or barber as the occupation.  That is further indication that these claims are fraudulent, because I believe that the SUBJECT PREMISES is

not a barber shop, tattoo parlor, or the residence of the
claimants, meaning that it is unlikely that the claimants are
associated with the SUBJECT PREMISES.  Also, based on my
training and experience, I know that a single physical address
submitting multiple UI claims is often an indication of fraud.

28.   In the above still images taken from surveillance
footage at the SUBJECT PREMISES, it appears that IZMITLIAN has a
computer at the SUBJECT PREMISES.  Based on my training and
experience, I know that any device connected to the SUBJECT
PREMISES' internet, including a computer or cellular phone,
could have submitted any of the 82 claims submitted from the
SUBJECT PREMISES' IP address.  Also based on my training and
experience, I know that UI fraudsters often maintain records
related to their frauds for a long period of time.  Accordingly,
I believe that IZMITLIAN's digital devices are likely to contain
evidence of the Subject Offenses.

29.   As referenced above, IZMITLIAN is known to maintain
pay-owe sheets recording his criminal activity at the SUBJECT
PREMISES.  Further, the text messages between K.R. and IZMITLIAN
indicate that K.R. collects money from individuals for whom
IZMITLIAN submits UI applications.  Accordingly, I believe that
IZMITLIAN's pay-owe sheets are likely to contain evidence of the
Subject Offenses.

30.   The Subject Telephone is a cellular phone that serves
as the business phone for the SUBJECT PREMISES.  Based on my
training and experience, I know that a business phone may be
stored at the business itself.  I also know that a cellular

telephone may be carried on one's person.  Accordingly, the
Subject Telephone may be stored at the SUBJECT PREMISES or on
IZMITLIAN's person.

## VI. <u>TRAINING AND EXPERIENCE ON THE SUBJECT OFFENSES</u>

31.  Based on my training and experience, and on
conversations with other law enforcement officers, I know that
UI fraudsters generally follow recognizable patterns, including,
among other things:

a.  Submitting numerous UI claims from a single IP
address.

b.  Using addresses the schemers control as the
addresses submitted to EDD for the claims so that EBP debit
cards and other EDD correspondence will be mailed to these
addresses and thus be accessible to the schemers.  Once the EBP
debit cards arrive, co-schemers commonly withdraw UI benefits
via ATMs or make POS purchases at merchants for goods and
services.

c.  Submitting UI applications on behalf of knowing
claimants, using the claimant's real address but with false
information concerning the claimant's income history or
occupation, and sharing the benefits with the claimant.

d.  UI fraudsters often maintain UI debit cards and
mail distributed by state workforce agencies in order to continue
to receive the funds and utilize them through ATM transactions or
point of sale purchases.  Fraudsters commonly maintain such items
in their homes, businesses, or in their vehicles.

e.   UI fraudsters often maintain paper records of their fraudulent UI activity.  Such records are commonly maintained for long periods of time, including in residences, businesses, and vehicles.

32.  UI fraudsters commonly use computers, cellular telephones, and other electronic devices to communicate with other fraudsters about their defrauding activities through the use of telephone calls, text messages, email, chat rooms, social media, and other internet and applications-based communication forums to obtain and distribute personal identifying information.  The fraudsters also utilize these devices to apply for the UI benefits and to transfer and/receive the benefits. Therefore, evidence related to UI fraud is likely to be found on electronic storage media found at the SUBJECT PREMISES, as further described below.

VII.  **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**[5]

33.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

---

[5] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

a.      Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.      Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.      The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

       d.    Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for devices
or data that cannot currently be decrypted.

    34.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

       a.    Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so
many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

       b.    Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of

data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

35.   The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

a.   Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or eye,
and the device will automatically unlock if that physical feature
matches one the user has stored on the device.  To unlock a
device enabled with a fingerprint unlock function, a user places
one or more of the user's fingers on a device's fingerprint
scanner for approximately one second.  To unlock a device enabled
with a facial, retina, or iris recognition function, the user
holds the device in front of the user's face with the user's eyes
open for approximately one second.

b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when a
device has been restarted or inactive, has not been unlocked for
a certain period of time (often 48 hours or less), or after a
certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an enabled
device may exist for only a short time.  I do not know the
passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress IZMITLIAN's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of IZMITLIAN's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

36.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

## VIII. <u>CONCLUSION</u>

37.  For all of the reasons described above, there is probable cause to believe that the items to be seized described in Attachment B will be found in a search of the person of ERIC IZMITLIAN and the SUBJECT PREMISES, as described in Attachments A-1 and A-2.


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this ____ day of March, 2021.


_____
HONORABLE KAREN STEVENSON
UNITED STATES MAGISTRATE JUDGE